IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84691-4-I |
| Respondent, | |
| v. | DIVISION ONE |
| AMERICAN TOBACCO CO., | UNPUBLISHED OPINION |
| Defendant, | |
| COMMONWEALTH BRANDS INC.; COMPANIA INDUSTRIAL de TABACOS MONTE PAZ, SA; DAUGHTERS & RYAN, INC.; FARMERS TOBACCO CO.; HOUSE OF PRINCE A/S; ITG BRANDS, LLC; JAPAN TOBACCO INTERNATIONAL USA, INC.; KING MAKER MARKETING INC.; KRETEK INTERNATIONAL; LIGGETT GROUP LLC; P.T. DJARUM; PETER STOKKEBYE TOBAKSFABRIK A/S; PHILIP MORRIS USA, INC.; R.J. REYNOLDS TOBACCO COMPANY; REEMTSMA CIGARETTENFABRIKEN GMBH; SANTA FE NATURAL TOBACCO COMPANY; SCANDINAVIAN TOBACCO GROUP LANE LIMITED; SHERMAN'S 1400 BROADWAY NYC, LLC; TOP TOBACCO, LP; VON EICKEN GROUP; and WIND RIVER TOBACCO CO. LLC, | |
| Appellants. | |

SMITH, C.J. — "The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for essential services" and it "derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982). This essential sovereign power is at the center of this case.

In the late 1990s, several states, including Washington, entered into a Master Settlement Agreement (MSA) with participating tobacco manufacturers (PMs) requiring the PMs to make annual cash payments to the states in perpetuity. To hold non-participating manufacturers liable, Washington enacted chapter 70.157 RCW, which requires all tobacco manufacturers selling tobacco products in Washington to either join the MSA and make annual payments or remain outside the MSA but deposit money into escrow for each "unit[] sold" of tobacco bearing "the excise tax stamp of the State."

In the early 2000s, the State enacted legislation permitting the governor to enter into compact agreements with the Indian tribal governments. Tobacco products sold under the compact agreements bear tribal tax stamps rather than state tax stamps and are not subject to chapter 70.157 RCW's escrow deposit requirement. Following recent litigation over the definition of "units sold," the superior court granted the State's motion for declaratory relief, ruling that "units sold" does not encompass tobacco products bearing a tribal tax stamp. The PMs moved the court to clarify that its order did not apply to cigarette sales under the

2

Puyallup Tribe's compact because that compact has a unique revenue sharing provision. The court denied the PMs' motion and they appealed.

The central question presented on appeal is whether an agreement by the Puyallup Tribe and the State to share revenue collected by the Puyallup Tribe's tax stamp transforms the tribe's tax stamp into an "excise tax stamp of the State." We conclude that it does not.

FACTS

The Master Settlement Agreement

In 1998, forty-six states reached a landmark public health agreement with major manufacturers in the tobacco industry. Under the terms of the Master Settlement Agreement (MSA), the states settled their claims against the participating tobacco manufacturers in exchange for annual cash payments to be made in perpetuity. Collectively, tobacco manufacturers that are party to the MSA are called "Participating Manufacturers," or PMs.

Manufacturers that have not joined the MSA or agreed to its terms are called "Non-Participating Manufacturers," or NPMs. To ensure the NPMs remained solvent against future liability, Washington enacted chapter 70.157 RCW, which requires any tobacco manufacturer selling in the state to either join the MSA and abide by its terms or remain outside the MSA and make escrow deposits for each "unit[] sold" of tobacco bearing "the excise tax stamp of the State." RCW 70.157.010(j).

## Compact Litigation

While most cigarettes sold in Washington are taxed by the State, some are exempt from state tax, such as sales on tribal reservations. RCW 82.24.295; RCW 43.06.455(3). State efforts to impose and collect cigarette taxes on cigarettes sold by tribal retailers to non-tribal consumers have a long and fraught history of litigation. So, in 2001, in an effort to ameliorate tribal relations, the state legislature authorized the governor to negotiate and enter into cigarette tax compacts with Washington tribes. RCW 43.06.455. Under this compact system, cigarettes sold on reservations are subject to a tribal excise tax—equal to that of the State—in lieu of the State excise tax. RCW 43.06.460. These cigarettes bear tribal excise tax stamps rather than excise tax stamps of the State. RCW 43.06.455(4).

## The Puyallup Compact

In 2005, the State enacted legislation permitting the governor to enter into a compact agreement with the Puyallup Tribe. RCW 43.06.465. The Puyallup compact legislation was intended to "address the uniqueness of the Puyallup Indian reservation and its selling environment through pricing and compliance strategies, rather than through the imposition of equivalent taxes." RCW 43.06.465(1).[1] Like the other tribal compacts, the State retroceded its cigarette

---

[1] The statute's findings and intent statement further explains: "The 2001 legislation and its later amendments did not encompass the Puyallup Tribe of Indians within its scope due to the very different nature of the cigarette trade on the Puyallup Indian reservation. The legislature therefore intends to address the special circumstances on the Puyallup Indian reservation by recognizing the substantial distinctions and enacting legislation authorizing a cigarette tax

excise taxing authority from Puyallup tribal retailers and cigarettes sold on the Puyallup reservations. The Puyallup Tribe then instituted its own tribal tax. The tax collected on Puyallup compact sales is a tribal tax and collected "in lieu of the combined state and local sales and use taxes, and state cigarette taxes." RCW 43.06.465(2). Cigarettes sold under the Puyallup compact bear a tribal cigarette stamp, rather than a State tax stamp. RCW 43.06.465(7). Unlike other tribal compacts, the Puyallup compact contains a revenue sharing provision by which the Tribe agrees "to transmit thirty percent of the tribal tax revenue on all cigarette sales to the state." RCW 43.06.465(3).

## Motion for Clarification

Several months after the superior court's order granting the State's motion for declaratory judgment, the PMs moved the court to clarify that compact cigarette sales under the Puyallup Tribe's compact qualify as "units sold" and are thus subject to the escrow requirements under the MSA.[2] The PMs contended that the revenue sharing provision constitutes a tax of the State and that the Tribe's stamp is, for all intents and purposes, a stamp of the State. The State opposed the motion as untimely. It also contended the revenue sharing provision did not transform the Tribe's tax into a tax of the State and argued that the compact cigarettes were not "units sold" because they did not bear an excise tax stamp of the State.

---

agreement with the tribe that differs from the contracts entered into under RCW 43.06.460." RCW 43.06.465.

[2] As discussed in State v. American Tobacco Company, No. 84264-0-I (Wash. Ct. App. _____ ____, 2023) (Tobacco I), NPMs are required to deposit into escrow a flat fee for qualifying "units sold."

5

The court denied the PMs' motion for clarification. In its order, the court concluded that their motion was untimely and that, as a matter of law, cigarettes sold under the Puyallup compact are not "units sold." The court determined that "[t]he revenue sharing component of the Puyallup compact does not warrant different treatment than the other tribal compacts in Washington under the plain language of RCW 70.157.010(j)." The PMs appealed.

ANALYSIS

We are presented with four questions on appeal. First, whether the underlying dispute—whether the superior court had authority to issue a declaratory judgment—is subject to arbitration. We conclude that it is not. We addressed that question in State v. American Tobacco Company, No. 84264-0-I (Wash. Ct. App. ____ ___, 2023) (Tobacco I). Second, whether the PMs' motion for clarification was truly a motion for clarification and not a motion for reconsideration or for relief from a judgment. We conclude that it was a motion for clarification. The PMs requested the court further explain its order, not that it grant them new rights. Third, whether the appropriate standard of review for a motion for clarification is abuse of discretion or de novo. Long settled case law dictates that the standard is an abuse of discretion. Fourth, whether the motion was untimely, and if not, whether the court abused its discretion in denying the motion. Because motions for clarification are not subject to time constraints, the motion was not untimely. And because the court correctly interpreted the meaning of "units sold" to not include Puyallup compact sales, we conclude it did not abuse its discretion in denying the PMs' motion.

6

Authority of Superior Court to Issue Declaratory Judgment

As an initial matter, the PMs maintain that the court erred in determining that its declaratory judgment applied to cigarettes sold under the Puyallup compact because the court did not possess the authority to do so. The PMs assert that this issue is subject to mandatory arbitration under the MSA. Because we determined in Tobacco I that the underlying dispute is not subject to arbitration, we disagree.

Characterization of Motion

The parties next dispute whether the PMs' motion for clarification is truly a motion for clarification and not a motion for reconsideration or for relief from a judgment. We conclude that the motion was a motion for clarification.

A motion for reconsideration or relief from a judgment seeks to alter the court's original ruling, either extending or reducing the parties' rights. Rivard v. Rivard, 75 Wn.2d 415, 418, 451 P.2d 677 (1969); see also CR 59. "A decree is modified when rights given to one party are extended beyond the scope originally intended, or reduced." In re Marriage of Thompson, 97 Wn. App. 873, 878, 988 P.2d 499 (1999). On the other hand, a motion for clarification is "merely a definition of the rights which have already been given and those rights may be completely spelled out if necessary." Rivard, 75 Wn.2d at 418. "It neither grants new rights nor extends old ones." Kemmer v. Keiski, 116 Wn. App. 924, 933, 68 P.3d 1138 (2003).

Here, the PMs' motion seeks confirmation "that sales of compact tribal cigarettes on which the State of Washington . . . now acknowledge[s] it receives

7

tax revenue are not covered by the Court's February 16, 2022 Order." (Emphasis omitted.)  The PMs contend that the court was not previously aware of the revenue sharing provision of the Puyallup Tribe's compact and that this provision alters the court's earlier analysis interpreting "units sold" because—in the PMs' eyes—the money received via the revenue sharing provision constitutes a tax of the State.  They ask the court to clarify that cigarette sales under the Puyallup compact are "units sold."

This request constitutes a motion for clarification rather than a motion for reconsideration or to amend the judgment.  Although the court's declaratory judgment was premised on a different factual scenario that did not include revenue sharing, the judgment covered the issue of tribal stamps and tribal taxes, both of which are at the heart of the matter here.[3]  The court previously determined that tribal stamps and taxes are not stamps or taxes of the State. The PMs' motion asks the court to determine whether tribal taxes are still tribal taxes when some of the revenue collected from that tax is shared; the motion does not ask the court to fashion new rights or change its earlier ruling—it requests confirmation that the court's interpretation of "units sold" is still applicable when the Tribe elects to share its tax revenue with the state.  Thus, the motion is properly characterized as a motion for clarification.

---

[3] The court's declaratory judgment did not discuss tax revenue, only that the State agreed to retrocede its excise tax and that all packs must bear a stamp of the State to qualify as a "unit sold."

Standard of Review

The parties also disagree about the applicable standard of review. The PMs contend that the proper standard is de novo because the court found that its previous declaratory judgment applied as a matter of law to Puyallup compact sales. The State maintains that the court's ruling on a motion for clarification is reviewed for an abuse of discretion. We agree with the State.

Motions for clarification are untethered from any civil rule. Nevertheless, Washington courts allow requests for clarification to define rights which have already been determined. Because the parties dispute the applicable standard of review—and because the appropriate standard of review is so important to our analysis—some background on the standard of review for clarification motions provides helpful context.

The standard of review on a motion for clarification was first clearly discussed by our Supreme Court in Starkey v. Starkey, 40 Wn.2d 307, 242 P.2d 1048 (1952), in the context of child custody. In Starkey, an interlocutory order gave the father "reasonable rights of visitation," which the mother moved to restrict. 40 Wn.2d at 318. The trial court denied the mother's request. Starkey, 40 Wn.2d at 317. On appeal, our Supreme Court concluded that if the mother's request was for clarification, then "the trial court did not abuse its discretion in rejecting such request." Starkey, 40 Wn.2d at 318. A few years later, our Supreme Court reiterated in Rivard, another child custody matter, that a motion for clarification is reviewed for an abuse of discretion. 75 Wn.2d at 419-20.

9

Following Starkey and Rivard, Washington appellate courts have continued to apply an abuse of discretion standard to motions for clarification. See, e.g., Wood v. Wood, 7 Wn. App. 252, 254, 498 P.2d 913 (1972) (reviewing court's clarification of custody provisions for an abuse of discretion); In re Marriage of Jennings, 138 Wn.2d 612, 625, 980 P.2d 1248 (1999) (reviewing clarification of dissolution decree for an abuse of discretion); In re Marriage of Christel and Blanchard, 101 Wn. App. 13, 20-21, 1 P.3d 600 (2000) (reviewing motion to clarify commissioner's order on custody provisions for an abuse of discretion). After 2000, there are few, if any, published cases that discuss the applicable standard of review. However, the many unpublished cases since then have continued to apply an abuse of discretion standard, generally citing either Blanchard or Rivard. See, e.g., In re Parentage of R.D.C., noted at 148 Wn. App. 1006, slip op. at 4 (2009); In re Marriage of Sushak and Beasley, noted at 168 Wn. App. 1010, slip op. at 2 (2012); In re Marriage of Sinsheimer and Kruger, No. 75675-3-I, slip op. at 1 (Wash. Ct. App. Jan. 16, 2018) (unpublished) https://www.courts.wa.gov/opinions/pdf/756753.pdf; In re Marriage of Phillips and Krida, No. 78590-7-I, slip op. at 1-2 (Wash. Ct. App. Apr. 22, 2019) (unpublished) https://www.courts.wa.gov/opinions/pdf/785907.pdf.[4]

We note—and decline to follow—a published case from Division II which concluded that review of a motion to clarify a dissolution decree is de novo. In re

---

[4] Unpublished opinions of the Court of Appeals have no precedential value, but may be cited as nonbinding authorities if identified as unpublished and may be accorded such persuasive value as the court deems appropriate. GR 14.1(a). We may also cite unpublished opinions where, as here, doing so is "necessary for a reasoned decision." GR 14.1(c).

Marriage of Michael, 145 Wn. App. 854, 859, 188 P.3d 529 (2008) ("Generally, we review a clarification of a dissolution decree de novo").[5] None of the three cases cited by the Michael court support its proposition that the proper standard of review is de novo. The first case, Stokes v. Polley, did not involve a clarification; rather, it involved *interpretation* of a dissolution decree—a question of law reviewed de novo. 145 Wn.2d 341, 346, 37 P.3d 1211 (2001). The second case, In re Marriage of Holmes, discussed modification of a parenting plan under the guise of a "clarification" motion and states that the appropriate standard of review is an abuse of discretion. 128 Wn. App. 727, 734-36, 117 P.3d 370 (2005). The third case, In re Marriage of Spreen, did not involve a clarification, but a modification of a maintenance order. 107 Wn. App. 341, 346, 28 P.3d 769 (2001). The Spreen court reviewed the order for substantial evidence and for legal error. 107 Wn. App. at 346.

Long settled precedent directs that the appropriate standard of review is an abuse of discretion.[6] A trial court abuses its discretion if the decision is

---

[5] We note two other cases that have either quoted or adopted Michael's erroneous standard of review: In re Marriage of Shirley, noted at 157 Wn. App. 1040, slip op. at 2 (2010) and In re Marriage of Mullan, 142 Wn. App. 1022, slip op. at 3 (2008).

[6] The PMs assert that Wood is inapposite because that case involved issues of child custody. But motions for clarification are not confined to family law matters, though they are used more frequently in the family law context. See 15 DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 39.14 (3rd ed. 2018) (clarification motions not as widely used in practice other than family law); 14 DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 2:2 (3rd ed. 2018) (clarification motions used widely in family law cases, but in all cases, the court will determine if party is seeking clarification or modification); see also Wellman & Zuck, Inc., v. Hartford Fire Ins. Co., 170 Wn. App. 666, 285 P.3d 892 (2012) (motion for clarification in products liability case); Grange Ins. Ass'n v. Roberts, 179 Wn. App. 739, 320 P.3d 77 (2013) (motion for clarification of

manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "[A] ruling based on an erroneous legal interpretation is necessarily an abuse of discretion." Endicott v. Icicle Seafoods, Inc., 167 Wn.2d 873, 886, 224 P.3d 761 (2010).

## Motion for Clarification

Next, we must determine whether the PMs' motion for clarification was time barred. We conclude that it was not. We then must determine whether the court abused its discretion in denying the motion for clarification. We conclude that it did not.

Unlike a motion for reconsideration or relief from a judgment, both of which are subject to time constraints and must be brought under CR 59 or CR 60, a motion for clarification is not time restricted. Kemmer, 116 Wn. App. at 933.

---

summary judgment order in insurance case); ABC Holdings, Inc. v. Kittitas County, 187 Wn. App. 275, 348 P.3d 1222 (2015) (motion for clarification in environmental matter); Johnson v. Horizon Fisheries, LLC, 148 Wn. App. 628, 201 P.3d 346 (2009) (motion for clarification in personal injury action).

Our conclusion as to the appropriate standard of review also aligns with the standard federal courts apply to review of motions for clarification. As in Washington, "[t]here is no Federal Rule of Civil Procedure specifically governing motions for clarification." United States v. All Assets Held at Bank Julius, Baer & Co., 315 F. Supp. 3d 90, 99 (D.D.C. 2018). Still, parties in federal proceedings may file a motion for clarification to explain or clarify something ambiguous or vague, but not to alter or amend. United States v. Philip Morris USA Inc., 793 F. Supp. 2d 164, 169 (D.D.C. 2011). Federal appellate courts also review a trial court's decision on a motion for clarification for an abuse of discretion. See, e.g., Int'l Rectifier Corp. v. Samsung Electronics Co. Ltd., 361 F.3d 1355, 1360-62 (Fed. Cir. 2004); Schwartz v. Internal Revenue Serv., 511 F.2d 1303, 1307 (D.C. Cir. 1975).

Because there is no time constraint for bringing a motion for clarification, the PMs' motion was timely and the court erred in concluding that it was not.[7] But despite the court's error in determining that the motion was untimely, it did not abuse its discretion in denying the motion because its decision did not rest solely on the motion's timeliness. The court articulated a second, independent basis for denying the motion: "[c]igarettes sold under the Puyallup cigarette tax compact are not 'units sold' as defined by RCW 70.157.010(j) as a matter of law for the same reasons explained in [its] February 16, 2022 Order." Therefore, the crux of our analysis is whether the court properly interpreted the Qualifying Statute.

When interpreting a statute, " '[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to the plain meaning as an expression of legislative intent.' " Hanson v. Carmona, 1 Wn.2d 362, 373, 525 P.3d 940 (2023) (alteration in original) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). If a statute is clear on its face, "we are 'required to assume the Legislature meant exactly what it said and apply the statute as written.' " Hobbs v. Hankerson, 21 Wn. App. 2d 628, 632,

---

[7] Where a court rule or statute does not provide for a time constraint, Washington courts generally impose a "reasonable" time limitation. See, e.g., Auto. United Trades Org. v. State, 175 Wn.2d 537, 542, 286 P.3d 377 (2012) (UDJA does not have explicit statute of limitations, but lawsuits under the UDJA must be brought within a reasonable time); Clark County Pub. Util. Dist. No. 1 v. Wilkinson, 139 Wn.2d 840, 847, 991 P.2d 1161 (2000) (writs of certiorari are not subject to formal time restraints, but must be filed within a reasonable time).

507 P.3d 422 (2022) (internal quotation marks omitted) (quoting HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 452, 210 P.3d 297 (2009)).

As explained in Tobacco I, the court properly determined in its February 16 order that RCW 70.157.101(j) is unambiguous. Therefore, we consider only the plain language of the statute and apply the words as written.

The plain language of the statute defines "units sold" as (1) tobacco products subject to State excise taxes that (2) bear an excise tax stamp of the State. RCW 70.157.010(j). The PMs assert that the court's interpretation of "units sold" as applied to Puyallup compact sales is erroneous because "[i]n all practical respects, there is no material difference between a purchase of a putative 'tribal' cigarette on the Puyallup Indian Reservation and the purchase of any other stamped, SET[8]-paid cigarette anywhere else in Washington." The PMs claim that "[i]n substance, therefore, a 'Puyallup' tax stamp is 'the excise tax stamp of the State,' and Puyallup compact cigarettes are 'units sold.' " The PMs also contend that the revenue sharing provision of the compact transforms a tribal tax into a State tax.

These arguments rest on a mistaken and offensive view of the Puyallup Tribe's sovereignty and taxing authority; it is legally indefensible to treat a sovereign nation as a municipality of the state. The difference between a tribal tax stamp and a State tax stamp is not merely "superficial visual graphics" as the PMs assert. Rather, the tribes are "distinct, independent political communities," free from state intrusion on that sovereignty. Worcester v. Georgia, 31 U.S. 515,

---

[8] State excise tax.

519, 8 L. Ed 483 (1832). Contrary to the PMs' belief, the Puyallup Tribe is not like a city or other subdivision of a state that derives taxing power from the state; it is its own source of power—a power that derives from sovereignty. Merrion, 445 U.S. at 147. Tribal stamps are expressions of that separate sovereignty; they originate from a separate power than state stamps. That the Puyallup Tribe agreed to share its tax revenue—from taxes that only it collects and enforces—is not a waiver of its inherent sovereignty. And the State did not, by enacting the compact legislation, simply transfer enforcement powers to the Tribe. Rather, the State foregoes imposing its tax and the Tribe exercises its taxing authority and imposes its own tax. A revenue sharing agreement does not affect the source of the power that allows for the tribal tax's imposition. The court correctly concluded that the revenue sharing component of the Puyallup compact does not warrant different treatment than the other tribal compacts. Tribal taxes and stamps are still not, and cannot by definition be, taxes and stamps of the State.

We affirm.

_Smith, C.J._

WE CONCUR:

_Birk, J._          _Chung, J._

15